Case number 19-5409, John Higgins et al. v. Kentucky Sports Radio LLC et al. Argument not to exceed 15 minutes per side. Mr. Kent Wicker, you may proceed for the appellants. Good morning, Your Honor. May it please the Court. Ken Wicker for the appellants. I'd like to reserve three minutes for rebuttal. The defendants here assembled a virtual mob of their listeners and followers and sent them off to cause harm to John Higgins and his family and his business. All because he made calls that they didn't like in a basketball game. They enabled, encouraged, and rewarded the harassment and the threats and laughed about it on their radio and television programs. There is nothing in the First Amendment or anywhere else that gives the defendants immunity for this type of conduct. As you know, Your Honor, the Supreme Court addressed this issue, this kind of issue, in Brandenburg v. Ohio. And the Court said there that the First Amendment protects advocacy, even advocacy of unpopular positions. But it does not protect speech that calls for imminent violence or other lawless conduct, explicitly or implicitly. And that's what the defendants did here. They called for their followers to, quote, continue the hate, to, quote, join in the fun, by, quote, crushing John Higgins and his roofing business. The conduct that they incited and encouraged violated the law, specifically Kentucky's criminal statutes dealing with harassment communications and harassment. Encouraging this type of lawless activity is not protected by the First Amendment. And the District Court was wrong to dismiss the case. Were they really encouraging lawless activity? Wasn't it repeatedly the announcers saying that we're not saying you should do this or don't do this? Wasn't that part of the message that was being conveyed? So part of the message was they would say you shouldn't do this. And this was on the television program. You shouldn't do this. And then in a lower voice, keep it up. You shouldn't do this. Was that the guest or was that Jones? It was the guest, but it was on the Kentucky Sports Radio program. So they're publishing a statement. Yeah, but you're suing the radio station and the host. They don't know what a guest is going to say. Well, I suggest the facts were otherwise judged. They didn't know what the guest was going to say. And it was reasonable at least for them to expect what the guest was going to say because the whole program was devoted to harassing John Higgins and encouraging their followers to do that. And when you look at the expanse of all the things that they were saying over a three-day period telling the viewers to keep it up Matt Jones saying it's a busy day on KSR as Matt and Ryan continue the hatred for John Higgins. Join in the fun. Publishing a comment saying maybe Big Blue Nation could call and tell Higgins he sucks as a referee. I take it you're not arguing that the topic of this sports Kentucky basketball doesn't count as much in First Amendment values as opposed to say politics and other issues. It doesn't matter that it's just sports or just Kentucky basketball? I think when you look at the subject matter of the comments, the subject matter that originated the comments, you have to go past that and you have to look at the words of the comments. So if the defendants say we think the NCAA doesn't do it's job very well, that's certainly a matter of public concern that is deserving of First Amendment protection. How about questioning referees calls? Does that count in the same level or is that diminished because it's just sports and it's just a basketball game? Well it's certainly not as important as political questions that the First Amendment is designed to protect, but I think more than that and more importantly than that, if the comments are let's call John Higgins and put 800 one-star Google reviews to destroy his business, then it doesn't make any difference what the motivation is. Maybe you do that because you don't like his political views, maybe you do that because you don't like his calls in a basketball game, but that particular speech that we have sued about is not the criticism of his basketball calls, it's the harassment and the encouraging of the followers to harass him. One way in which I'm quite sympathetic to your position is he's allowed to be a referee he's allowed to have to deal with criticism for being a referee and making allegedly bad calls and yet what's destroyed or really hurt is his business, which is private, so that's a really compelling point with just one caveat that his URL address is called Rooferies, so he seems to be mixing a little bit his reffing with his business and isn't that a great vulnerability that's his problem and not anybody else's? Well maybe that's a point for a jury to decide, but I don't think you can fairly look at the record and say that he invited any kind of abuse that he received here. Three days of endless phone calls two weeks of his business being shut down and even today those reviews on Google cannot be removed and he has still went from the highest rated roofing business in Omaha to the lowest. I take it the North Carolina fans didn't respond and rank him higher? You know, sometimes you think more speech is helpful, but it didn't work in this situation. Where were they? Where do you draw the line in terms of public concern? I mean, you're not arguing that a media outlet cannot report as to negative reviews of someone. Are you going that far that that in and of itself is impermissible? No, Your Honor. Maybe that has some news value and becomes public concern in a different context, but the act of encouraging inciting people to go onto a website and leave a false bad review or to threaten someone or to do other things that harass someone. All of that is prohibited by Kentucky's harassment statutes and there's no suggestion that those are unconstitutional, but certainly reporting on a news story is protected, but doing the criminal act that creates the news story is not. Well, wasn't the identification of his business, didn't that happen online and so forth before the talk shows? I thought that came out before the radio did anything or Jones did anything. Well, no. It was reported on the website. They posted a website that had a video that embedded in the video was the phone number for the business, his home telephone number. Just tell me if I'm wrong. I thought this was public that this referee had this business before the radio did anything, whether online or on air. No, of course. It's a public business that advertises for customers. No, I'm not making that point. I'm making the point that was brought to the attention of the Kentucky faithful basketball fans that he had this business and some of the criticism started before the radio show. Am I wrong about that? Well, there is some mention in the I don't believe that's in the record, at least not in the many complaints that it was brought to that there was a publication of his roofing business before it was brought to the attention of the KSR listeners by KSR. That's my understanding. Well, what should the radio station have done in retrospect? Let's just say hypothetically that this identification with the referee of the business had already occurred. Let's say, no surprise, Kentucky faithful are unhappy in the way some other college fans tend to be unhappy when folks game in their booths and there's some close calls. And let's say there's a lot of stuff going online and it's super unpleasant. In other words, it's just all of this stuff, but no connection to the radio station initially. Is the radio station really supposed to take the position we can't say what's happening? By saying what's happening, they are fanning the flames. Everyone knows if you live in Columbus, Ohio or Kentucky in this kind of situation, you are fanning the flames. There's no way to deny it. And so, are they really supposed to just not report what's happening? Or are they supposed to get up and defend the guy in an office and say don't do this? I think the easier question to answer is what they cannot do. But I'll answer that question. I think it's fair that they can report on the news story. But they can't... But what's problematic is by just saying here's what's happening. Let's read some of the stuff online. They're not embracing it. They're not distancing themselves. They're literally just covering it. We all know what's happening. That is going to fan the flames, even though there's no intent. And they're just covering this story, which probably for three days is the biggest news story in Kentucky. Well, Judge, I think we're helped out by the procedural posture that we're in in this case. You say that there's no intent, but even the complaint says that there was. No, I'm trying to... I'm asking a hypothetical that is not this case, but I'm trying to figure out what are they supposed to do? They're really innocent. They don't want to hurt anybody, but they also want to do their job of reporting on something that's a pretty big event. And it's big not because it really matters in the universe, but it matters to the people of Kentucky for these three days. Because they all watch the game, and they're still really unhappy. Well, I think the ultimate decision of where they go and how they do it is a jury question, or at least a summary judgment question. And you look at each of those cases... Do you want to subject... Do you want them to go to trial every time they report on a controversial topic? No. Or editorialize. They report, and they give a little editorial. I certainly understand the point, Judge Braylor, but what I don't want them to do is give out my client's home telephone number. I don't want them to cackle while they're counting the number of bad reviews in real time. I don't want them to publish comments from people encouraging others to go online and leave there. I'm having trouble applying our traditional notions to the modern technological age. Everyone gets yelling fire in a crowded theater or a crowded courtroom. But today, communication is so easy. And anything that happens in public life or private life ends up on the internet, on some social media platform. We all know the term going viral. So it's quite easy for things to really spiral, and lots of people to participate and comment one way or the other. It's sort of hard to figure out where to draw a line given the modern realities of technology and communication, and people don't quite free to comment on lots of things sometimes, and honestly sometimes publicly. The technology is certainly different, but the concept of it is still the same. What we have here is a case where defendants directed hateful comments and encouraged others to direct hateful comments to particular people with referees and judges. And maybe the court should impose a rule that allows victims to recover for this type of conduct. Let me pose just a hypothetical. Say someone came outside your house or into your courtroom and played a loud alarm for 30 minutes. But he did it because he didn't like a ruling that you had issued. And had a very different political view than you did. And it was intended because of his political beliefs and he intended to use this as symbolic speech. But he wouldn't pretend that. That's harassment. It's made illegal by Kentucky law and law of every state in the country. That's not speech. It's probably a fire drill violation. It's a criminal rule, but I'm not sure about harassment parties. But we may have a claim for harassment under the elements that are required under Kentucky law. And we show under Brandenburg that the defendants were encouraging this conduct. And that's a claim that should go forward. Just to let you know, you're really focused on incitement and not really defamation. So we should really think about this as an incitement case? Well, it is an incitement case. But we also have a conspiracy to defame claim that the judge did not handle properly. And we briefed that issue as well. Good morning. Good morning, your honors. Jason Rensselaer on behalf of the KSR Media Defendants, Kentucky Sports Radio, Matt Chant and Drew Franklin with me at council table are my partners Jeremiah Byrne and Griffith Sumner. Your honors, the plaintiff's claims seek to impose liability solely on the basis of speech published online, broadcast over the airwaves that commented on third party actions that were simultaneously being covered and commented on by other media outlets as well. The essence of the plaintiff's claim is that the content and viewpoints expressed in this coverage were insufficiently negative, were overly favorable. I mean, he's a limited public figure for a person being a referee. And if he's going to be a referee in big games and make calls, he's open to criticism. He has to know that. And it's not important. But I don't understand why that job and that risk requires him to undertake the risk of having his business destroyed when a group of fans are really unhappy with the game. And there is just no doubt that the radio station, and Jones in particular, had something to do with Tannich and his business. I don't know how anyone can deny that. And we shouldn't be happy with that. It's a motion to dismiss stage. I don't know. Your honors, something to do is not in sight under this court's precedence. The Anbach decision in Bible Believers, the Trump, Are you making an intent point, or what's the point you're getting at? No. The first test of incitement, your honor, is there must be some speech looking at the words themselves that specifically advocate unlawful action. The public figure analysis goes to defamation. That may be relevant to whether these third party actions in harassing, whether the fan actions in harassing Mr. Higgins are actionable. But their claim is that my clients encouraged that and incited that, and this court and the Supreme Court has been very clear that the category of actionable incitement that's excluded from First Amendment protection is extremely narrow. And in the Trump case, the court particularly emphasized that the first and most critical finding at the motion to dismiss stage is to examine the words spoken themselves to determine if there is a call to illegal action. So here, your mind could be very cynical about what happened, that this announcer knew just what he was doing. It's almost like he had a law degree. He knew just what he could say, but he also knew his audience, and he knew this was an audience that did not need even a match. Just a rock-by-rock was going to inflame this thing, and he could be very subtle and not incite in the way we think of that word, and yet have the exact same effect. Why can't we pay attention to that reality? It's a clear reality. You can pay attention to it, but it's not enough. The kind of core teaching of the Trump decision is that the reaction of third parties is not what determines whether speech is actionable as incitement. There are three prongs to the incitement standard. The first is you look to the words themselves for an actual advocacy of illegal action. The second is to look at the speaker's intent, and the third is the likely result, and what Trump says is you can't take evidence and facts relevant to prong two and three and use them to eliminate the need to look at prong one, and if one looks... Just tell me, just to be clear about these facts, if Jones had said, here's the website address, here's the name of the company, all people that really are true fans of Kentucky basketball would go either call, write reviews, or do anything they can to destroy this business. Would that get passed, motion dismissed? So that's the quote. I know it's not this case. That would be incitement, right? Your Honor, I'm hesitant to comment on hypotheticals. The point is, that is not this case. Okay, wait. I hate to break it to you. That is all we do. You want to win for your client today, and we do not want to issue a ruling that we have to denounce tomorrow for the next case. You have to tell me about the next case. And you know what my next question is? Because I think the answer to my question is yes, that would get you passed, motion dismissed, and then that solves the problem in this case. Why is that exactly what he did, just more subtly? The more subtly point is that there is an absence of any such call to action in this case. There are no words like the ones that you just spoke alleged in the first amended complaint. You can read through every allegation they make about the statements of my client. There is not one statement that's akin to real Kentucky fans will call this guy. In fact, there are seven instances in the first amended complaint where they concede that my client specifically told listeners not to do that. But their claim is that because those comments were described as funny, that sort of indirectly gave affirmation to people who had doubts, and caused them to want to maybe try to get that affirmation in the future. But that sort of attenuated relationship is not the kind of specific call to illegal action that prong one of Brandenburg requires, and it's the reason that this court in trouble. It's just so formalistic and so inattentive to reality. I mean, what if there had been no news about this roofing business, no one knew that, the radio station finds it out, does a program that's all about the game, talks about the bad calls so they're allowed to do that, and then they say now we're really frustrated with this, but we do not think it would be a kind thing to do for a Kentucky fan to do anything to Mr. Higgins and his roofing business. I don't think you should do anything with his URL, describe the whole URL, I don't think it would be good to post comments there, I don't think it would be good to go on Facebook and say negative things about his roofing business, I don't think it would be a good idea to call this phone number, his roofing business, I think that would be really unfair and that would really hurt his business, and we really would hate to have this bad game into his business being destroyed. So everything they say is technically virtuous, but to me quite evil. I mean, of course we know what's going to happen with that, and you would say that's not incitement, because it doesn't have the language of the incitement cases, and I would say that's preposterous, you know, just what they were doing. Well, but that's not this case here. There's nothing like that in this case. First of all, every comment... The laughing after, we shouldn't do this, and then, but I love it? Well, but I love it is the sidekick, as your honor mentioned, and it wasn't on the radio show, it was on the television show, which is a property of the television station, who they haven't sued. Mr. Jones is an employee, or was an employee of the television show. He doesn't own that show, KSR doesn't own that show. Which is the point, you have to look at the words, but that is the teaching of Trump, is that if you put the decision about whether speech is protected in the hands of a listener, and what they think it means, and how they're likely to react, you eliminate the predictability of what is and isn't protected, and you chill speech, which is why the first step in an incitement analysis is to look at the words themselves, not the expected reaction. And in this case, it wasn't the instance that this had never been mentioned, there was no other discussion about it. Every allegation they make about my clients commenting on this activity, is commenting on activity that had already occurred. Your honor said, isn't it true that the information had already circulated? That is alleged in the first amended complaint. Paragraph 21 says, this website that suggests you should call Mr. Higgins' business and gave us his number, was produced on another website, and it was circulated widely on fan forums, the original complaint cites at least one of them, but on other fan forums, before being posted as a comment on the KSR website. Which goes to another point, which is the plaintiff's constant effort to conflate the statements of my clients with the statements of third party commenters. Did your clients not have any obligation to monitor the comments? Legally, they can't be held liable as speakers. They haven't alleged a claim for defamation based on republication of those comments, because they can't. Under Section 230 of the Communications Decency Act, a website post cannot be held liable as a speaker for content that was And there's the additional problem that defamation claims and actionable falsehoods have to be comments that can be reasonably understood to create statements. In fact, all of these comments are hyperbole in the category that the Falwell v. Hutzler decision So if the host had expressly said, you should go to the webpage, or you should go to the Facebook page, and give a negative review, that would plainly satisfy problem one. You would then look to attack and likely react. But you cannot judge the protected nature Doesn't that all sound like something that would probably survive 12 v. 6? That may survive 12 v. 6, your honor. But the Trump case says, at the 12 v. 6 stage, remember in Trump, the district court held that Trump's comments implicitly called for violence And the 6th Circuit said, you can't that's not a permissible inference, because there's no explicit call for violence in the statement, get him out of here. And it couldn't be plausibly interpreted as an implicit call, because he couples that with an express exhortation against unlawful action. If you look at the First Amendment complaint, seven times, every single time, essentially, they allege that my clients commented on this third-party comment, that it already occurred, which by its very nature can't be a call to future unlawful conduct. They're always commenting on something that has previously happened. But almost every time, it's accompanied by a specific exhortation against unlawful action, and under Trump, that precludes a Twombly permissible inference that this was an implicit call to action. So it's not the case where he's winking and nodding and saying, oh, it would be terrible if you did this, don't do this. He's saying, this has happened, here's my take on it, but you shouldn't do it. Under the Trump decision, that is subject to dismissal at the 12 v. 6 stage. Your Honor, also I think it's important to address the question of what is the public controversy and whether it was created by these clients. And I think, as Your Honor mentioned, and as we said, they've alleged in the complaint that this had occurred, this was already occurring at the time it was being commented on. They've admitted in their briefs that other- Slide over a little. Every time you move your left arm, I think you're going to hit your car. I apologize. I promise I won't. I don't want to fight anyone's case. Read me words. Out of this. Right. I noticed there's blue on this side and red on this side. I don't know what that means. It's not intentional, Your Honor. It's an option of art. And then just to briefly address the conspiracy claim, Your Honor. That is a conspiracy, as they point out on page 44 of their brief, to induce third-party conduct. The fact that they're saying that the third-party conduct would be what is defamation doesn't change the legal standard applicable to whether my client's comments are actionable. The conduct of my clients, to which they seek to attach liability, is incitement, and therefore governed by Brandenburg. What's your best case? I don't see many cases in this area about sports. What's your best case that's a sports-related case, whether it's incitement or defamation? That sports is a public controversy? Yeah, and just something that arises in an incitement or defamation setting that involves sports, as opposed to political figures. Your Honor, the very first case that extended New York Times v. Sullivan beyond public figures is the Supreme Court's Curtis Publishing decision, which involved an article alleging that Bear Bryant and Wally Butz had fixed the Georgia- Alabama game by sharing secrets. So, there's a long history and tradition of recognizing that sports, particularly when they garner significant public attention, are matters of public concern. The plaintiffs want to separate the fan reaction from the game itself. While there is a degree of separability, they're also intertwined. This isn't a case where people are harassing a ref for calls made at a Little League game. The fan reaction is, in a sense, closely related to the high-profile nature of this game. And the fan reaction itself was a matter of public concern, as evidenced by the fact that the reaction was separately widely covered by the media, and speaks to broader issues. How would the First Amendment, if radio shows and TV were just forced to say, listen, you can talk about in this context the referee, you can say whatever you want in terms of if it's public, repeat what's been said, but you have to draw the line at their private, whether it's their family, family members, which you can imagine happening, go intimidate the kids at this school. You just have to draw a line. Why does that hurt the First Amendment? They get to say all they want about the game, how bad the calls were, whatever, but there's a line about their family, their private life, their private business. I don't understand how that hurts the First Amendment. Well, Your Honor, I think your question to opposing counsel put the problem succinctly. What is the media supposed to do when this phenomenon is occurring, when there is, as we all know, this widespread campaign to buy fans, buy third parties, who aren't related to my clients, to retaliate? Do they just pretend that's not happening? No, no. Do they have a gag order? Do they cover that they just draw the line in anything about intimidation trying to hurt, destroy the family, their business? I don't see why that's so bad. Do they not cover the fact that third parties are engaging in that intimidation? I mean, there's not an allegation, Your Honor, that my clients did anything to intimidate or harass the clients. There's no harassment by these defendants. The allegation is their coverage of third party harassment. And your client is sort of the number one conduit of this group of people, Kentucky fans, right? I mean, this is probably the number one public gathering place for fans of the Wildcats, and is there some additional obligation for an organization like that that's such a loud speaker on this topic to not even come close to the affirmative insight or just indirectly or some subtle insight? Your Honor, I don't think the First Amendment imposes higher standards on one defendant versus another because their ratings are higher or they have more visitors on their website. The reach is greater. The reach is far greater. The likelihood of harm being caused or the words being acted on is higher. Well, the way that the First Amendment draws that line is to look at specifically what you said, the words being acted on. The fact that they have a broader reach also means that more people are looking to them for news about what's going on and for their views about what's going on. The focus is on the speech and whether the speech that is broadcast in a traditional public forum in looking at sort of content, form, and manner that the Snyder case, Chief Justice Roberts' opinion, tells us we need to focus on. The fact that there are a lot of people looking only demonstrates that this is exactly where we expect free speech to occur. If we inhibit speech more stringently because more people are participating, I would submit that's contrary to the values the First Amendment is designed to protect. Thank you, Your Honor. Let me start with your hypothetical and the questions that I think were designed to talk about what if it's not an explicit incitement but you know from the words and the tone and the setting and the mannerisms that that's exactly what they want to do. Well, that's dealt with in grander terms. That's the implicit part of the encouragement. And I suggest that there is ample evidence of both explicit and implicit. Let me give you just one example. In paragraph 36, we quote Matt Jones saying that like the rest of Big Blue Nation, we're still upset by Higgins' call to the game and we can and will read the Facebook reviews on the air. And then he goes through a number of offensive disgusting reviews on the air. Including one that says, I think your best bet is for your own safety never call into the Kentucky game again. Don't piss off Kentucky fans. We'll make your life hell. So what does Trump say? Your friend on the other side says our Trump decision says implicit messages don't work for incitement purposes. You met the motion to dismiss stage. Is that wrong or is he asking what he said? I don't think that's a fair reading of Trump. I think what Trump says is that read in context as we're asking this court to do, read in context the first statement from the president that said get them out of here was followed immediately by Del Pertham in equal tone and equal measure. This is very different. Here he's saying, he's giving an opportunity to all his listeners to harass the claims. He's giving them website address, phone numbers of how to do it. And then he's rewarding them by reading those harassing comments on the air or online and then he's keeping score, laughing about how they've gone from 35 star reviews to 600 one star reviews and how this is getting crushed on the internet. Those, I think that's explicit, but it's certainly implicit that he's encouraging and inciting and rewarding his listeners to do all those things that they are doing that he knew they were doing and he knew they would continue to do. As to the question about causation and intent, those are jury questions and let's let this case go back to the district court and let a jury resolve those questions on the facts of this case. Alright, thank you so much. Thanks to both of you for your excellent briefs and excellent oral arguments. It's a really tricky case and it's going to be submitted and the court may call off the next case.